U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2018 DEC -4  AM 11: 53

CLERK

BY _____
DEPUTY CLERK

UNITED STATES OF AMERICA,       )
                                )
v.                              )          Case No. 2:18-cr-00049
                                )
ANGELO PETER EFTHIMIATOS,       )
                                )
Defendant.                      )

**OPINION AND ORDER**
**DENYING DEFENDANT'S MOTION IN LIMINE**
**TO EXCLUDE STATEMENTS OBTAINED IN VIOLATION OF *MIRANDA***
(Doc. 54)

Defendant Angelo Peter Efthimiatos is charged with knowingly piloting an aircraft without an airman's certificate in violation of 49 U.S.C. § 46306(b)(7). Pending before the court is Defendant's motion in limine to exclude statements obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). Defendant seeks to suppress statements he made while on the airport's tarmac and in a law enforcement vehicle on the grounds that law enforcement agents subjected him to custodial interrogation without informing him of his *Miranda* rights. In addition, Defendant asserts that certain post-arrest statements were obtained impermissibly from him after he invoked his right to counsel. In an expedited response, the government opposed the motion. The court held an evidentiary hearing on November 29, 2018 at which Drug Enforcement Agency ("DEA") Special Agent ("SA") Brandon Hope testified. The court took the motion under advisement as of the hearing date.

The government is represented by Assistant United States Attorneys Eugenia A. Cowles and Nicole P. Cate. Defendant is represented by Craig S. Nolan, Esq.

**I.    Findings of Fact.**

The court finds the following facts have been established by a preponderance of the evidence.

On the evening of April 9, 2018 at approximately 9:00 p.m., two DEA SAs with authority to enforce violations of Title 49 of the U.S. Code and a Drug Task Force Agent ("TFA") arrived at the Rutland-Southern Vermont Regional Airport (the "Airport"), a small airport in central Vermont with only two runways. At the time, the Airport was closed to the public. In order to access the controlled portion of it, the agents obtained an access card from Airport authorities. Earlier that day, at approximately 6:38 p.m., SA Hope had been notified that a Piper Saratoga aircraft with tail number N4563F (the "Aircraft") was leaving the Airport and appeared to be en route to either Nantucket or Martha's Vineyard.

At the time of their arrival at the Airport, the agents were investigating whether Defendant was piloting the Aircraft for several reasons. Because of his prior conviction in the Southern District of Iowa ("S.D. Iowa") for transportation of marijuana with an aircraft, the agents were concerned that Defendant might be smuggling money or contraband. They were also aware that Defendant's airman's certificate had been revoked as a result of his S.D. Iowa conviction and thus believed that, if he was piloting the Aircraft, he was doing so without a license. Finally, they knew that Defendant was on supervised release for his S.D. Iowa conviction and that he had conditions associated with that supervision which prohibited him from leaving the District of Vermont without his probation officer's prior permission.

When the agents entered the controlled access portion of the Airport, they found a vehicle associated with Defendant parked nearby. The agents established a position behind a building and awaited the return of the Aircraft. At approximately 11:54 p.m., SA Hope was notified that the Aircraft was approaching the Airport, the first aircraft they had seen take off or land since their arrival. SA Hope watched as the Aircraft passed over the Airport, turned around, and activated the runway lights. The Aircraft landed at approximately 12:15 a.m. on April 10, 2018 and an individual who appeared to be Defendant (based on photographs the agents had viewed) emerged from the Aircraft. Defendant proceeded in the direction of his vehicle. When he saw the three agents approaching him, Defendant seemed momentarily startled and asked who was there.

2

TFA John McGarghan called out in a loud voice, identifying the three agents as law enforcement officers and advising that they were there to conduct a "ramp check." At the time, all three agents were dressed in civilian clothing. Although they were likely armed, their weapons were neither displayed nor brandished.

SA Hope asked Defendant his name and Defendant responded "Angelo." When asked, he produced a driver's license and an airman's certificate but stated he did not have his medical certificate. Other than accepting the licenses from Defendant's hand and returning them, the agents did not physically touch Defendant at this time. When asked if his airman's certificate was valid, Defendant replied that it was. Defendant showed the agents photos on his cell phone that depicted the work he was doing on the Aircraft. When SA Hope advised Defendant that he was going to step away and verify his airman's certificate with the Federal Aviation Administration,[1] Defendant informed DEA SA Kevin Kadish that something "funny" had happened with his license and that it had been revoked for transporting marijuana with an aircraft. He stated it had since been "taken care of" through a lawyer in Pennsylvania. SA Kadish asked about the S.D. Iowa conviction and asked if Defendant had permission to leave the State of Vermont. Defendant replied that he did not have permission and had left a couple of times. Defendant expressed concern that if the S.D. Iowa judge who sentenced him found out he was flying without a license, she would "screw" him.

The tone of the conversation on the tarmac was consistently conversational and Defendant freely volunteered information to the agents. Defendant was not advised that his arrest was imminent. Correspondingly, he was not told he was free to leave. This portion of the agents' encounter with Defendant was neither audio nor video recorded.

The conversation on the tarmac lasted less than ten minutes before Defendant advised the agents that he was feeling ill. He sat down on the tarmac and may have lied down on it as well. Because of the frigid temperature, the agents suggested they continue their conversation in a vehicle. Defendant agreed and helped the agents move TFA

---

[1] This was apparently a ruse as SA Hope did not make the call.

3

McGarghan's car into the controlled access area with Defendant's access card. Although SA Hope does not recall whether Defendant was patted down for weapons before getting into TFA McGarghan's vehicle, he credibly testified that it would be standard operating procedure to do so.

SA Kadish got into the front passenger seat next to TFA McGarghan and Defendant sat in the back seat with SA Hope. Defendant was not handcuffed at this time or physically touched by the agents. When Defendant entered the vehicle, SA Hope activated a digital recorder. He summarized what Defendant had told them and asked further questions about the status of Defendant's airman certificate. Defendant admitted that he was merely in the process of getting it reinstated and that he was working with his attorney "Joseph" from Pennsylvania but he could not provide his attorney's last name. The conversation continued in a conversational manner with Defendant volunteering information and frequently interrupting the agents. Defendant asked if there was anything the agents wanted to ask him. He stated he wanted to get his bags out of the Aircraft and put them in this vehicle and the agents agreed that he could do so.

SA Hope asked for Defendant's consent to search the Aircraft and it was granted. Defendant and the agents left the vehicle and Defendant assisted the agents in searching the Aircraft by opening up the locked hatch and other compartments. No drugs or contraband were found. When the search of the Aircraft was completed, Defendant was informed that he was under arrest for flying without a license and handcuffed. Defendant asked that his own vehicle be moved outside the controlled access area so that his wife could pick it up. This request was granted. He was permitted to call his wife to explain that he had been arrested.

Upon his arrest, Defendant was read *Miranda* warnings by SA Hope from a card. He did not invoke his right to silence or his right to counsel. He was not questioned at that time. Thereafter, TFA McGarghan transported Defendant as far as Vergennes, Vermont. En route, they engaged in casual conversation during which Defendant said nothing substantive regarding the grounds for his arrest. In Vergennes, because there had been a temporal interlude and because he would now be transporting Defendant, SA

4

Hope again provided *Miranda* warnings.  In doing so, he and Defendant engaged in the following colloquy which was digitally recorded:

> **Agent Hope:**  We can take care of that here in a second.  Just give me one second.  So I just want to just read you Miranda again just real quick, if you're okay with that, since it was a little bit.
>
> So, again, before we ask you any questions, you must understand that you have the right to remain silent.  Do you understand that?
>
> **Mr. Efthimiatos:**  I do.
>
> **Agent Hope:**  Okay.  Anything you say can and – can be used against you in court.  Do you understand that?
>
> **Mr. Efthimiatos:**  I do.
>
> **Agent Hope:**  All right.  You have the right to, to talk to a Lawyer for advice before I ask you questions, and to have a Lawyer with you during questioning.
>
> **Mr. Efthimiatos:**  Okay.
>
> **Agent Hope:**  All right.  Do you understand that?
>
> **Mr. Efthimiatos:**  I do.
>
> **Agent Hope:**  Okay.  If you cannot afford a Lawyer, one will be appointed for you, before a – any questioning, if you wish.
>
> **Mr. Efthimiatos:**  Okay.
>
> **Agent Hope:**  Do you understand?
>
> **Mr. Efthimiatos:**  I do.
>
> **Agent Hope:**  Okay.  Are you willing to answer any questions?
>
> **Mr. Efthimiatos:**  I, I am willing to answer questions.  But I do want an, an Attorney, also.
>
> **Agent Hope:**  I – I'm sorry.  What do you –
>
> **Mr. Efthimiatos:**  I do want an Attorney, also.  But I am very willing to answer questions.
>
> **Agent Hope:**  So, do you want an Attorney with you right now, before we start talking?
>
> **Mr. Efthimiatos:**  Is that –

**Agent Hope:**  Like, would you like to consult with an Attorney?  I mean, we're driving right now, obviously.  But –

**Mr. Efthimiatos:**  Right.

**Agent Hope:**  -- I mean, would you like to consult with –

**Mr. Efthimiatos:**  Are you going to interview me at the, at the jail?

**Agent Hope:**  No, no, not – this is more so – I guess, right now, this is more of a conversation.  It's, it's not really – it's more to just having a back-and-forth conversation.  But I want you to be aware of your rights.

**Mr. Efthimiatos:**  Okay.

**Agent Hope:**  That's really what it is.

**Mr. Efthimiatos:**  I understand.

**Agent Hope:**  So, do you – would you prefer to have an Attorney with you before we do that?  Would you prefer to –

**Mr. Efthimiatos:**  We can have –

**Agent Hope:**  – talk to an Attorney –

**Mr. Efthimiatos:**  – a back-and-forth conversation.

**Agent Hope:**  That's okay –

**Mr. Efthimiatos:**  Sure.

**Agent Hope:**  – with you?

**Mr. Efthimiatos:**  Yes.

**Agent Hope:**  Okay.  All right.

**Mr. Efthimiatos:**  You're recording this?

**Agent Hope:**  Huh?  I am.

**Mr. Efthimiatos:**  Okay.

**Agent Hope:**  Yeah.  So, just so that way there's no mistake, you know, what you said or anything, and no one's putting words in your mouth, or anything like that.  All right.  So – and because I'm driving and I don't want to --

**Mr. Efthimiatos:**  Right.

**Agent Hope:**  – I don't want to take notes while I'm driving.  So, are you comfortable, first of all, with the heat and everything?

6

**Mr. Efthimiatos:**  I'm so cold.  It's ridiculous.

**Agent Hope:**  I'm trying to turn it up.  I have you like –

**Mr. Efthimiatos:**  I, I know.  I'm, I'm –

**Agent Hope:**  Yeah.

**Mr. Efthimiatos:**  But I know you're probably just –

**Agent Hope:**  No, I don't do that.

**Mr. Efthimiatos:**  – suffering –

**Agent Hope:**  No, actually, believe it or not, I'm actually – I'm always cold.  I'm probably – like I tell people all the time, even in my office, I'm always cold.  So, I'm a little warm right now, but I'm always –

**Mr. Efthimiatos:**  You're based out of Burlington?

**Agent Hope:**  I am.  Yeah.  Yeah.

**Mr. Efthimiatos:**  Are you going to let me use that, so I can switch up that phone, phone?

**Agent Hope:**  Yeah, yeah.  We will, we will take care of that.  But we will – I can talk to you [indiscernible].  Well, I can – I guess we can talk about it right now.  You're talking about your phone, right?

**Mr. Efthimiatos:**  I am.

**Agent Hope:**  Okay.  So, with your phone, I don't plan on giving it back to anyone but you.

**Mr. Efthimiatos:**  Yeah.  But that may not –

**Agent Hope:**  But just in case –

**Mr. Efthimiatos:**  Yes.

**Agent Hope:**  – I can – we can change your password.

**Mr. Efthimiatos:**  Yes, I would like that.

**Agent Hope:**  All right.  Is it –

**Mr. Efthimiatos:**  I will give you the password.

**Agent Hope:**  – is it okay for us to download your phone, and, like, just download the contents of your phone, just to make sure that there's no drug conversation, or anything like that, on it?

**Mr. Efthimiatos:** As long as you're looking solely for drug conversation, go for it. You can download what you want.

**Agent Hope:** What does – what do you mean by that, like –

**Mr. Efthimiatos:** If you're looking for drug conversation, there is no drug conversation.

**Agent Hope:** Okay.

**Mr. Efthimiatos:** I don't sell drugs. I don't do drugs. I have nothing to do with any kind of drugs.

(Doc. 58-3 at 3-7.) Defendant and SA Hope engaged in a further discussion in a conversational tone with Defendant continuing to volunteer information and interrupt frequently.

## II. Conclusions of Law and Analysis.

### A. Whether Defendant was in Custody for *Miranda* Purposes While on the Tarmac.

Defendant argues that he was subjected to custodial interrogation while he was speaking to agents on the tarmac, and that because he was not informed of his *Miranda* rights at that time, the statements he made should be suppressed. Defendant contends that "[n]ext to handcuffs, being surrounded by three government law enforcement agents at night with no other persons present and then being confined in the backseat of a government vehicle is probably the most recognizable indicia of a formal arrest." (Doc. 54 at 5.)

The Fifth Amendment to the United States Constitution guarantees that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. To effectuate this right, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 U.S. at 444.

The question of "whether a suspect is 'in custody' is an objective inquiry." *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011). The analysis begins "by asking whether a reasonable person would have thought he was free to leave the police encounter at issue.

8

If the answer is yes, the *Miranda* inquiry is at an end; the challenged interrogation did not require advice of rights." *United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004).  If, however, "a reasonable person would not have thought himself free to leave," the court must determine whether "a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *Id.*  An individual is in custody for purposes of *Miranda* "[o]nly if the answer to this second question is yes[.]" *Id.*  In conducting this inquiry, the court must consider "all of the circumstances surrounding the interrogation[.]" *J.D.B.*, 564 U.S. at 270-71 (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam)).

> Those circumstances include, *inter alia*, the interrogation's duration; its location (e.g., at the suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; [and] whether officers told the suspect he was free to leave or under suspicion[.]

*United States v. FNU LNU*, 653 F.3d 144, 153 (2d Cir. 2011).

"[T]here are three types of encounters between police and individuals, each with different ramifications under the Fourth Amendment." *United States v. Glover*, 957 F.2d 1004, 1008 (2d Cir. 1992).  "The first type is a consensual encounter whereby an individual willingly agrees to speak to law enforcement personnel.  Such contact may be initiated by the police without any objective level of suspicion and does not, without more, amount to a seizure" under the Fourth Amendment.  *Id.* (internal quotation marks and citation omitted).  "Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation by coercive means." *United States v. Drayton*, 536 U.S. 194, 201 (2002).

"The second type of encounter[]" is "a limited investigative stop" pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968) and must be justified by "a reasonable suspicion supported by articulable facts that criminal activity may be afoot." *Glover*, 957 F.2d at

1008 (internal quotation marks omitted). "[S]uch investigative detentions are 'seizures' under the Fourth Amendment[.]" *Id.*

Finally, there is an arrest, which "must be based on probable cause." *Id.* Here, Defendant does not challenge probable cause for his arrest.

The relevant factors for identifying whether and what type of a seizure has occurred include:

> the threatening presence of several officers; the display of a weapon; physical touching of the person by the officer; language or tone indicating that compliance with the officer was compulsory; prolonged retention of a person's personal effects, such as airplane tickets or identification; and a request by the officer to accompany him to the police station or a police room.

*Gilles v. Repicky*, 511 F.3d 239, 245 (2d Cir. 2007) (internal quotation marks omitted).

During the initial encounter on the tarmac, the interactions between the agents and Defendant took the form of a *Terry* stop. *See United States v. Padilla*, 548 F.3d 179, 186 (2d Cir. 2008) ("Under *Terry*, a police officer may briefly detain an individual for questioning if the officer has a reasonable suspicion that the individual is, has been, or is about to be engaged in criminal activity.") (internal quotation marks omitted). A *Terry* stop "must be 'justified at its inception.'" *United States v. Freeman*, 735 F.3d 92, 96 (2d Cir. 2013) (quoting *Terry*, 392 U.S. at 20). "[T]he amount of suspicion needed to justify [a *Terry* stop] is less than a 'fair probability' of wrongdoing, and 'considerably less than proof of wrongdoing by a preponderance of the evidence.'" *Padilla*, 548 F.3d at 186-87 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). An officer must have "a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). Additionally, the stop and inquiry must be "reasonably related in scope to the justification for their initiation." *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (quoting *Terry*, 392 U.S. at 29).

When the agents encountered Defendant on the tarmac, they had a reasonable and articulable suspicion that Defendant had been flying the Aircraft without a license in

violation of federal law.  At no point during this brief conversation did the agents use physical restraints or a threat of force and at no point did they tell Defendant that he was under arrest or that he was not free to leave.  The fact that this interaction involved three officers and took place at night is insufficient to render their questioning custodial in nature.  There was no apparent restraint on Defendant's freedom of movement beyond the presence of the agents.  The ramp check was performed by law enforcement agents dressed in civilian clothing, was brief in duration, and did not extend beyond the scope justified by their reasonable suspicion.  Based on the totality of the circumstances, Defendant was not in custody during his conversation with the agents on the tarmac.  *See Maryland v. Shatzer*, 559 U.S. 98, 113 (2010) ("the temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not constitute *Miranda* custody") (citation omitted).  His motion to suppress on this basis is therefore DENIED.

### B.    Whether Defendant was in Custody for *Miranda* Purposes While Seated in TFA McGarghan's Vehicle.

After the conversation on the tarmac, Defendant moved at the agents' suggestion into TFA McGarghan's vehicle due to the frigid temperature.  The mere fact that Defendant was in a government vehicle does not mandate a finding that he was in custody.  *See United States v. Santillan*, 902 F.3d 49, 61 (2d Cir. 2018) (concluding defendant who was "questioned, frisked, and asked to sit in the back of a police car[]" was not in custody for purposes of *Miranda*); *United States v. Rakowski*, 714 F. Supp. 1324, 1335 (D. Vt. 1987) (holding defendant was not in custody where he entered the agent's vehicle voluntarily); *but see United States v. Valentine*, 657 F. Supp. 2d 388, 391 (W.D.N.Y. 2009) ("The mere fact that [defendant] was not physically forced into the [police] vehicle does not mean that he could reasonably have believed that he had much choice in the matter.").  Defendant walked to and from the vehicle independently.  While in the vehicle, the agents and Defendant continued their conversation based on information that Defendant provided which warranted further investigation.  At the conclusion of the relatively brief conversation, Defendant asked to retrieve two bags from

11

the Aircraft and the agents agreed that he could do so. He consented to a search of the Aircraft and assisted the agents in that search.

Throughout the encounter in TFA McGarghan's vehicle and in the search of the Aircraft, Defendant was not physically touched or restrained in any manner. The agents neither displayed nor threatened force. The tone of the conversation was conversational and Defendant was not advised that his arrest was imminent. Regardless of whether a reasonable person in Defendant's position would have felt free to leave, Defendant's freedom of movement was not constrained commensurate with "a formal arrest." *Newton*, 369 F.3d at 672.

Based on the totality of the circumstances, Defendant was not subjected to custodial interrogation in TFA McGarghan's vehicle and *Miranda* warnings were thus not required. *See United States v. Faux*, 828 F.3d 130, 135 (2d Cir. 2016). Defendant's motion to suppress the statements he made in TFA McGarghan's vehicle is therefore DENIED.

## C.   Whether Defendant Invoked his Right to Counsel.

Upon his arrest, SA Hope read *Miranda* warnings to Defendant from a card and Defendant did not invoke his right to silence or right to counsel.[2] Defendant was not questioned at that time. TFA McGarghan transported Defendant as far as Vergennes, Vermont, at which point Defendant was moved into SA Hope's vehicle for the remainder of the trip to the correctional facility where he would be booked and detained pending a court appearance. When Defendant entered SA Hope's vehicle, SA Hope read Defendant *Miranda* warnings again. Defendant contends that after this second reading, he invoked his right to counsel by stating "I do want an Attorney, also." (Doc. 58-3 at 4.) This, however, is only a partial description of what occurred.

---

[2] A defendant seeking to invoke his *Miranda* rights "'must do so through a clear, unambiguous affirmative action or statement.'" *United States v. Oehne*, 698 F.3d 119, 123 (2d Cir. 2012) (quoting *United States v. Plugh*, 648 F.3d 118, 124 (2d Cir. 2011)). "A requirement of an unambiguous invocation of *Miranda* rights results in an objective inquiry." *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010) (holding that a suspect "who wants to invoke his or her right to remain silent [must] do so unambiguously.").

12

In order to invoke the right to counsel guaranteed under *Miranda*, a "suspect must unambiguously request counsel[,]" which requires the suspect to "articulate his desire to have counsel *present* sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis v. United States*, 512 U.S. 452, 459 (1994) (emphasis supplied). It is well established that, "[i]f an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights[.]" *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010) (quoting *Davis*, 512 U.S. at 459, 461-62).

After informing Defendant of his *Miranda* rights a second time, SA Hope asked Defendant if he was willing to answer questions, to which Defendant responded "I, I am willing to answer questions. But I do want an, an Attorney, also." (Doc. 58-3 at 4.) This statement was equivocal because while Defendant was clear in stating that he wanted an attorney, he was equally clear that he was willing to speak with SA Hope at that time. Because of the juxtaposition of these statements, Defendant could reasonably be understood to have requested that an attorney be appointed to him: (1) before questioning; (2) during questioning; or (3) in the criminal case connected to his arrest. In light of the ambiguity, SA Hope asked appropriate clarifying questions in order to determine whether Defendant wanted an attorney present before any questioning or whether he was willing to speak with SA Hope without an attorney present. In response, Defendant did not ask that an attorney be present but rather affirmatively clarified that he was willing to engage in a recorded "back and forth" conversation with SA Hope without an attorney:

> **Agent Hope:** Like, would you like to consult with an Attorney? I mean, we're driving right now, obviously. But –
>
> **Mr. Efthimiatos:** Right.
>
> **Agent Hope:** -- I mean, would you like to consult with –
>
> **Mr. Efthimiatos:** Are you going to interview me at the, at the jail?

13

**Agent Hope:** No, no, not – this is more so – I guess, right now, this is more of a conversation. It's, it's not really – it's more to just having a back-and-forth conversation. But I want you to be aware of your rights.

> **Mr. Efthimiatos:** Okay.

> **Agent Hope:** That's really what it is.

> **Mr. Efthimiatos:** I understand.

**Agent Hope:** So, do you – would you prefer to have an Attorney with you before we do that? Would you prefer to –

> **Mr. Efthimiatos:** We can have –

> **Agent Hope:** – talk to an Attorney –

> **Mr. Efthimiatos:** – a back-and-forth conversation.

> **Agent Hope:** That's okay –

> **Mr. Efthimiatos:** Sure.

> **Agent Hope:** – with you?

> **Mr. Efthimiatos:** Yes.

> **Agent Hope:** Okay. All right.

Doc. 58-3 at 4-5; *see McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991) (holding invocation of the right to counsel under *Miranda* requires "at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney *in dealing with custodial interrogation by the police*") (emphasis in original). Defendant proceeded to ask SA Hope about his cell phone and thereafter discussed a number of subject matters, some casual conversation and others investigatory, frequently interrupting SA Hope and volunteering information.

Because Defendant did not unequivocally express a "desire to deal with the police only through counsel," *Edwards v. Arizona*, 451 U.S. 477, 484 (1981), but rather affirmatively agreed to a conversation with SA Hope without one, Defendant's motion to suppress the statements made in SA Hope's vehicle on the grounds that his right to counsel was violated must be DENIED.

14

## CONCLUSION

For the reasons stated above, Defendant's motion in limine to exclude statements obtained in violation of *Miranda* (Doc. 54) is DENIED.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 4th day of December, 2018.

Christina Reiss, District Judge
United States District Court